## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| DANITA MCKENZIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 2:23-cv-00002-JHE |
| | ) | |
| THOMAS CLEVELAND, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Danita McKenzie ("McKenzie" or "Plaintiff") has filed an amended complaint alleging Defendants Deputy Thomas Cleveland ("Cleveland"), Deputy Jesse Adams ("Adams"), and Deputy Christopher Wade ("Wade") (collectively "Defendants") violated her rights pursuant to 42 U.S.C. § 1983 and Alabama law.  (Doc. 5).  Defendants move to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Docs. 13, 14).  McKenzie has filed a response to the motion to dismiss (doc. 25), and the Defendant deputies have filed a reply brief (doc. 26).  The motion is fully briefed.  For the reasons stated below, the motion to dismiss (doc. 13) is **DENIED**.

### I. Factual Allegations

#### A.  The Initial Encounter

The allegations in Plaintiff McKenzie's complaint arise out of an incident that occurred on

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 23).

or about May 12, 2020, after Plaintiff McKenzie called law enforcement to her home for assistance. (Doc. 5 at ¶ 8).  McKenzie's fiancé, James Fields ("Fields"), was struck by a vehicle in 2020 and sustained severe physical injuries and traumatic brain injuries.  (*Id.* at ¶ 9).  Since the accident, Fields routinely visits his neurologist and sometimes experiences outbursts stemming directly from his traumatic brain injury.  (*Id.* at ¶ 10).  Fields experienced a similar outburst on or about March 20, 2020.  (*Id.* at ¶ 11).  McKenzie called 911 requesting aid and for assistance transporting Fields to UAB Hospital for medical care and treatment.[2]  (*Id.*).

Deputies Cleveland, Adams, and Wade responded to McKenzie's call.  (Doc. 5 at ¶ 12). When the defendants arrived, Deputy Cleveland began questioning McKenzie on her front porch. (*Id.* at ¶ 13).  Either Deputy Adams or Deputy Cleveland secured Fields in the patrol unit.  (*Id.* at ¶ 14).

## B.  Video of the Alleged Assault

McKenzie explained to the defendant deputies that Fields attacked her as a result of his traumatic brain injury.  (Doc. 5 at ¶ 16).  Nevertheless, the deputies continued to ask McKenzie the same questions and did not offer her any assistance.  (*Id.*).  McKenzie requested the deputies take Fields to UAB Hospital or release him to her care so she could call 911 again to get him to UAB Hospital.  (*Id.* at 17).

McKenzie turned to walk into her house to call 911 and request an ambulance.  (Doc. 5 at ¶ 20).  As McKenzie turned toward her front door, Deputy Cleveland "suddenly and violently" grabbed McKenzie by the arm and told her to put her hands behind her back.  (*Id.* at ¶ 21).  Deputy

---

[2] Thus, the May 12, 2020 episode (at issue in this case) was the second time McKenzie requested this type of aid from local law enforcement.  Accordingly, McKenzie alleges the officers who responded to the call on or about May 12, 2022, had actual knowledge of Field's medical condition before they arrived.  (Doc. 5 at 3, fn.1).

Adams joined in and forcefully struck McKenzie's arm repeatedly. (*Id.* at ¶ 22). The deputies violently forced McKenzie to the ground and handcuffed her despite her pleas for them to stop because her minor child was at home. (*Id.* at ¶¶ 22-23). McKenzie continuously explained that she did not do anything wrong, and one of the deputies (either Cleveland or Adams) responded, "you're resisting now." (*Id.* at ¶ 25). At no point did McKenzie pose a threat to the officers, herself, or another person. (*Id.* at ¶ 27). Although he was at the scene, Deputy Wade did not intervene at all. (*Id.* at ¶ 28). McKenzie alleges her Ring doorbell video camera captured the entire incident. (Doc. 5 at 3, fn.2).

### C.  The Incident Report

On or about May 12, 2022, Deputy Cleveland drafted an arrest information sheet, number 2022-00037644, for the incident. (Doc. 5 at ¶ 29). In his report, Deputy Cleveland wrote in part, "I returned to Fields and notified Dispatch of McKenzie's possible incoming 911 phone call. Deputy Adams arrived on the scene to assist. I advised Deputy Adams on the information that I had obtained so far regarding the incident. Fields was secured in Deputy Adams patrol unit. Due to his previous injuries from the 2020 accident, Fields was handcuffed (double locked & fit checked) in the front of his body. Deputy Adams then attempted to speak with McKenzie to obtain more information. McKenzie stated the same responses to Deputy Adams as she did me and refused to answer his questions. At this point, a primary aggressor in the physical domestic incident could not be determined. McKenzie was advised that she was also going to be taken into custody." (*Id.* at 30).

McKenzie alleges the Ring doorbell video "completely contradicts" Deputy Cleveland's account of the events. (Doc. 5 at 6, fn.3). Specifically, she contends no officer told her she was being arrested, detained, or taken into custody at any point before she turned to go inside her home.

(*Id.*).

Deputy Cleveland continued, writing "McKenzie then attempted to retreat back into the residence through the front door.  McKenzie held onto the front door handle and refused to obey commands to put her hands behind her back."  (Doc. 5 at ¶ 31).  He continued, "McKenzie eventually released from the front door handle and attempted to move away from Deputy Adams and I.  McKenzie then lost her balance and began to fall to the ground.  Once there, Deputy Adams and I secured McKenzie in handcuffs."  (*Id.* at ¶ 32).

McKenzie alleges the Ring doorbell video shows the deputies grabbing her, while Deputy Adams struck her arm repeatedly after she turned to go into her home.  (Doc. 5 at 6, fn.4).  This was done without any indication McKenzie was being arrested, detained, or taken into custody before the violent attack.  (*Id.*).  McKenzie contends that Deputy Cleveland's arrest report is wholly inaccurate.  (*Id.* at fn.5).  She states the Ring doorbell video and audio evidence will show Deputies Cleveland and Adams violently grabbed McKenzie, Defendant Adams struck her arm repeatedly, and both Deputies Cleveland and Adams forced McKenzie to the ground and handcuffed her.  (*Id.*).  At no point did McKenzie "lose her balance."  (*Id.*).

## D.  McKenzie's Criminal Charges Dismissed

McKenzie and Fields were both taken into custody and charged with domestic violence in the third degree.  (Doc. 5 at ¶ 33).  Deputy Cleveland signed McKenzie's warrant, and McKenzie was booked in the Jefferson County Jail.  (*Id.* at ¶ 34).  McKenzie's criminal defense attorney shared the Ring doorbell video with the Jefferson County District Attorney's office.  (*Id.* at ¶ 35).  On or about August 9, 2022, Deputy District Attorney Paige West advised the District Court of Jefferson County that the case was due to be dismissed.  (*Id.* at ¶ 36).   That same day, District Judge Katrina Ross entered an order dismissing the criminal charges against McKenzie.  (*Id.* at ¶

37).

As a result of the incident. McKenzie alleges she has suffered and continues to suffer from anxiety, post-traumatic stress, and constant fear of law enforcement officials.  (*Id.* at ¶ 38). McKenzie is currently seeking treatment from a licensed counselor for her alleged emotional and psychological injuries.  (*Id.* at ¶ 39).

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing the pleader is entitled to relief." "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)). Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient. *Iqbal*, 556 U.S. at 678. (citations and internal quotation marks omitted). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 557). Rule 12(b)(6), Fed. R. Civ. P., permits dismissal when a complaint fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (citations and internal quotation marks omitted). A complaint states a facially plausible claim for relief "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The complaint must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Bell Atl. Corp.*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). Ultimately, this inquiry is a "context-specific task that

requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556
U.S. at 679.

### III. Analysis

#### A. The Amended Complaint is Not a Shotgun Pleading

Defendants contend the complaint should be dismissed because it is an impermissible
"shotgun pleading." (Doc. 14 at 5).  In support, Defendants cite Fed. R. Civ. P. 8(a), which requires
a complaint to include "a short and plain statement of the claim showing that the pleader is entitled
to relief." (Doc. 14 at 5).  They also point to Fed. R. Civ. P. 10(b), requiring a party to "state its
claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of
circumstances . . . . If doing so would promote clarity, each claim found on a separate transaction
or occurrence . . . must be stated in a separate count or defense." (*Id.*).  The purpose of these rules
is to allow the court to determine "which facts support which claims." *Weiland v. Palm Beach
Cnty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015).  Complaints that violate either or
both of these rules are often disparagingly referred to as "shotgun pleadings."

The Eleventh Circuit has identified four types of shotgun pleadings. *See Weiland*, 792 F.3d
at 1321.  The most common type is a complaint that has multiple counts, with each count adopting
the allegations of all preceding counts. *Id.*  This causes each successive count to carry all that
came before and the last count to be a combination of the entire complaint. *Id.*  Another somewhat
common type of shotgun complaint is a complaint that is replete with conclusory, value, and
immaterial facts not obviously connected to any particular cause of action. *Id.* at 1322.  Third,
there is a shotgun pleading that does not separate into a separate count each cause of action or
claim for relief. *Id.* at 1323.  The final type of shotgun pleading is a pleading that asserts multiple
claims against multiple defendants without specifying which of the defendants are responsible for

which acts or omissions, or which of the defendants the claim is brought against. *Id.* Regardless of category, a shotgun pleading is a pleading that fails to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests. *Id.*

Despite Defendants' contentions (doc. 14 at 5-8), McKenzie's amended complaint (doc. 5) is not an impermissible shotgun pleading. The Amended Complaint contains five separated counts or causes of action. (Doc. 5 at 7-14). Each count adopts and realleges *specific* paragraphs from the complaint's factual allegations and contains a separate paragraph identifying which defendant or defendants the particular claim is being asserted against. (*See id.*). The five separate counts in the Amended Complaint do not try to carry everything that came before them. The Amended Complaint is not replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action and certainly does not fail to separate into a different count each cause of action or claim for relief. Finally, the Amended Complaint does not assert multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

As pled, Defendants can adequately respond to the Amended Complaint. For these reasons, Defendants' request to dismiss the Amended Complaint as a shotgun pleading, or alternatively to strike the Amended Complaint and order McKenzie to replead her claims, is **DENIED**.

### B. Qualified Immunity is Not Appropriate at this Stage

Next, Defendants contend they are entitled to qualified immunity as to all of McKenzie's federal claims. (Doc. 14 at 8). McKenzie alleges Defendants violated her constitutional rights as secured by the Fourth Amendment, and such rights were clearly established at the time of the

incident.  (Doc. 25 at 7).

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  For qualified immunity to apply, a government official must initially establish he or she was acting within his or her discretionary authority when the alleged wrongful act occurred.  *Melton v. Abston*, 841 F.3d 1207, 1221 (11th Cir. 2016), *abrogated on other grounds by Bell Atl. V. Twombly*, 550 U.S. 544 (2007).  "Once it has been determined that an official was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity is appropriate." *Id.*  "First, the plaintiff must show that the official's alleged conduct violated a constitutionally protected right."  *Id.* "Second, the plaintiff must demonstrate that the right was clearly established at the time of the misconduct." *Id.*

Here, according to the allegations in McKenzie's Amended Complaint, Deputies Cleveland, Adams, and Wade were acting within their discretionary authority at the time of the alleged wrongful acts.  All three deputies were responding to McKenzie's 911 call requesting assistance in transporting Fields to UAB Hospital for medical care and treatment.  (Doc. 5 at ¶¶ 11-12).  Thus, the burden shifts to McKenzie to show the defendants are not entitled to qualified immunity from her excessive force, unreasonable seizure, and failure to intervene claims.

### 1.  Excessive Force (Deputies Cleveland and Adams)

Count I of McKenzie's Amended Complaint alleges § 1983 excessive force claims against Deputy Cleveland and Deputy Adams.  McKenzie alleges these deputies used unnecessary and excessive force when Deputy Cleveland violently grabbed her, forced her to the ground, and placed

her in handcuffs.  (Doc. 5 at ¶ 43).  She further alleges Deputy Adams used unnecessary and excessive force when he violently struck her repeatedly, forced her to the ground, and placed her in handcuffs.  (*Id.* at ¶ 44).

Excessive force claims in the context of an arrest are evaluated under the Fourth Amendment's objective "reasonableness standard."  *Hall v. McGhee*, 762 Fed. Appx. 837, 841 (11th Cir.  2019) (quoting *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)).  In excessive force claims, courts will analyze the officer's actions to determine if they were 'objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'"  *Id.*  Further, "the determination of whether the force used was reasonable is viewed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.*  In order "to balance the reasonableness of the force used, close attention must be paid to 'the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*  Additional considerations include "the need for the application of force, the relationship between the need and amount of force used, and the extent of the injury inflicted, and whether the force was applied in good faith or maliciously and sadistically. *Sevostiyanova v. Cobb Cnty.*, 484 Fed. Appx. 355, 360 (11th Cir. 2012) (quoting *Slicker v. Jackson*, 215 F.3d 1225, 1232-33 (11th Cir. 2000)).

McKenzie alleges she requested 911 assistance to transport Fields, her fiancé, who suffers from a traumatic brain injury, to UAB Hospital for medical care and treatment.  (Doc. 5 at ¶¶ 9-11).  Upon arrival, Deputy Cleveland admitted he understood Fields' condition.  (*Id.* at ¶ 16).  McKenzie alleges that when she turned to walk into her house to call 911 to request an ambulance, Deputy Cleveland suddenly and violently grabbed her by the arm and told her to put her hands

9

behind her back.  (*Id.* at ¶¶ 20-21).   She further alleges Deputy Adams joined and forcefully struck

her arm repeatedly.  (*Id.* at ¶ 22).

McKenzie's Amended Complaint contains sufficient allegations that, if taken as true, state

Deputy Cleveland and Deputy Adams used excessive force and violated a clearly established

constitutional right.

For a right to be clearly established, "the contours of [the] right must be sufficiently definite

that any reasonable official in the defendant's shoes would have understood that he was violating

it." *Mighty v. Miami-Dade Cnty.*, 659 Fed. Appx. 969, 973 (11th Cir. 2016) (quoting *Plumhoff v.

Rickard*, 134 S. Ct. 2012, 2023 (2014)).   "The salient question is whether the state of the law at

the time of [the] incident provided fair warning to the Defendant that his alleged conduct was

unconstitutional." *Id.* (quoting *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014)) (internal quotations

omitted).   The Eleventh Circuit has consistently "established[ed] that unprovoked force against a

non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's

rights under the Fourth Amendment." *Id.* (quoting *Fils v. City of Aventura*, 647 F.3d 1272, 1289

(11th Cir. 2011)).   The Amended Complaint alleges McKenzie did not resist arrest or pose any

threat to officer safety when they allegedly grabbed her, struck her arm repeatedly, and forced her

to the ground.   Prior to turning to go into her home, McKenzie reasonably believed she was free

to leave.

Defendants contend that by referencing the incident report, the Amended Complaint

confirms that McKenzie "refused to answer [the deputies'] questions" and that "a primary

aggressor in the physical domestic incident could not be determined." (Doc. 14 at 16) (citing doc.

5 at ¶ 33); (*See also* doc. 26 at 4-5).   This assertion is not supported by the record. McKenzie

alleges that Deputy Cleveland's incident report is "wholly inaccurate."   (*Id.* at 6, fn.5).

Furthermore, McKenzie alleges she was not given any indication that she was being arrested, detained, or taken into custody before the "violent attack." (*Id.* at 6, fn.4). Thus, Deputies Cleveland and Adams are not entitled to qualified immunity as to McKenzie's excessive force claim.

### 2.  Unreasonable Seizure (Deputies Cleveland and Adams)

In pertinent part, the Fourth Amendment to the United States Condition provides as follows:

> The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall note be violated . . . .

U.S. CONST. amend. IV.  For a seizure to be lawful, law enforcement must have (1) consent, (2) a warrant, or (3) probable cause.  *See Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 66 (1992).  As to probable cause, a law enforcement officer is entitled to qualified immunity if he has "actual probable cause" or "arguable probable cause" to make the seizure.  *Lee v. Ferraro*, 284 F.3d1188, 1195 (11th Cir. 2002).

Defendants argue that McKenzie's amended complaint confirms that she was taken into custody and charged with domestic violence in the third degree. (Doc.14 at 15-16).  They further point to McKenzie's allegation that she "refused to answer [the deputies'] questions" and that "a primary aggressor in the physical domestic incident could not be determined." (*Id.* at 15) (citing doc. 5, generally).  However, at this stage of the litigation, McKenzie's allegations are taken as true.  McKenzie alleges Deputies Cleveland and Adams grabbed her by the arm, forced her to the ground, and handcuffed her even though she posed no threat to the defendants, herself, or others. (Doc. 5 at ¶¶ 55-57).  She also alleges the information in Deputy Cleveland's incident report is fabricated and "completely contract[ed]" by her Ring doorbell video. (*Id.* at 6, fn.3).  At this stage of the litigation, McKenzie's allegations are taken as true, and Deputies Cleveland and Adams are

not entitled to qualified immunity as to McKenzie's unreasonable seizure claim.

### 3. Failure to Intervene (Deputies Adams and Wade)

In Count III McKenzie alleges Deputies Adams and Wade failed to intervene and ensure her safety during the incident. (Doc. 5 at ¶¶ 61-70). Generally speaking, "[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation . . . takes place in his presence, the officer is directly liable under Section 1983." *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir.1998) (citing *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir.1986)). Defendants argue the failure to intervene claim against Deputy Adams should be dismissed because he cannot be held liable for a failure to intervene claim and be liable for the underlying excessive force and unreasonable seizure claims. (Doc. 14 at 18; doc. 26 at 2-3). Defendants are correct that Deputy Adams cannot be liable for both the alleged excessive force and unlawful seizure as well as for failure to intervene. However, at this stage of the litigation, it is not unreasonable for McKenzie to be unsure whether Deputy Adams participated in the beating or failed to intervene. *See Velazquez v. City of Hialeah*, 484 F.3d 1340, 1342 (11th Cir. 2007). An excessive force claim does not fail simply because the plaintiff cannot identify the specific officer responsible for administering the excessive force in a collective beating. *Id.* "Were this the law, all that police officers would have to do to use excessive force on an arrestee without fear of consequence would be to put a bag over the arrestee's head and administer the beating in silence." *Id.*

At this early stage of litigation, McKenzie may allege alternative claims against Deputy Adams. The deputies' motion to dismiss McKenzie's Amended Complaint is **DENIED** as to Counts 1, 2, and 3.

### C. State Law Claims

McKenzie also asserts state law claims for Assault and Battery against Deputies Cleveland and Adams as well as a claim for Intentional Infliction of Emotional Distress against all defendants. (Doc. 5 at ¶¶ 71-86).

#### 1. Assault and Battery (Deputies Cleveland and Adams)

McKenzie alleges a state law Assault and Battery claim against Deputies Cleveland and Adams.  (Doc. 5 at ¶¶ 71-77).

In Alabama, a sheriff is an executive officer pursuant to the Alabama Constitution of 1901, Article V, § 112.  As an executive officer, a sheriff is immune from being sued in the execution of the duties of his office under Article I, § 14.  Further, a sheriff, as an employee of the State, "is immune from suit, in his official capacity, for negligent performance of his statutory duties." *Ex parte Haralson*, 853 So. 2d 928, 932 (Ala. 2003) (citations omitted).  Deputy sheriffs are immune to the same extent as sheriffs are immune because they are the "alter ego" of the sheriff.  *Id.* (citations omitted).  A deputy sheriff acting in his "official capacit[y] and individually" is immune from suit when the action is one against the State. *Id.* (citing *Phillips v. Thomas*, 555 So.2d 81, 83 (Ala.1989)).

Under Article I, § 14, Alabama Constitution of 1901, the only exceptions to State immunity for State officers, such as deputy sheriffs, sued in their official capacity are as follows:

> "[A]ctions brought (1) to compel him to perform his duties, (2) to compel him to perform ministerial acts, (3) to enjoin him from enforcing unconstitutional laws, (4) to enjoin him from acting in bad faith, fraudulently, beyond his authority, or under mistaken interpretation of the law, or (5) to seek construction of a statute under the Declaratory Judgment Act if he is a necessary party for the construction of the statute."

*Haralson*, 853 So. 2d at 932 (quoting *Parker v. Amerson*, 519 So.2d 442, 443 (Ala. 1987)).  These are not applicable in this case.

For years, it appeared Alabama courts had extended State immunity to sheriffs and other state officers if "the duty allegedly breached [was] owed solely because of the officer or employee's official position." *Ex parte Cooper*, 351 So.3d 501, 502 (Ala. 2021) (citing *Barnhart v. Ingalls*, 275 So. 3d 1112, 1125–27 (Ala. 2018)). However, more recently, the Alabama Supreme Court expressly overruled *Barnhart v. Ingalls*, 275 So. 3d 1112 (Ala. 2018). *See Ex parte Pinkard*, -- So. 3d --, 2022 WL 1721483 (Ala. 2022). The Alabama Supreme Court expressly held that "nothing in the text of § 14 [of the Alabama Constitution] prohibits courts from hearing a claim against an individual State employee if the claim does not name or seek relief from the State." *Pinkard*, 2022 WL 1721483 at *6. The court returned to its pre-*Barnhart* understanding of § 14, which recognized that State immunity does not bar claims that name and seek relief only from individual officers in their personal or individual capacity, as McKenzie does here.[3]

_____

[3] Some courts have found *Pinkard* only applies to statutory officers and not to constitutional officers like the defendants here. *See Reynolds v. Calhoun*, No. 1:21-CV-649-ECM, 2023 WL 1954372, at *4 (M.D. Ala. Jan. 13, 2023) ("Importantly, the cases analyzing official-capacity State immunity for statutory officers, including *Pinkard*, do *not* include claims against any of the nine executive officers listed in Article V, § 112 of the Alabama Constitution: "a governor, lieutenant governor, attorney-general, state auditor, secretary of state, state treasurer, superintendent of education, commissioner of agriculture and industries, and a sheriff for each county."); *Hight v. Smith*, No. 6:21-CV-01307-LSC, 2022 WL 17178660, at *4 (N.D. Ala. Nov. 23, 2022) ("[T]he recent decision in *Ex parte Pinkard* did not purport to change the longstanding special status of sheriffs and their deputies . . . . Rather, *Pinkard* overruled a recent series of cases that dealt with other types of state officials.").

Notably, though, the Alabama Supreme Court did not explicitly confine its analysis to statutory officers. Instead, *Pinkard* disavowed the proposition that "'claims against State officials that indisputably involve[] conduct within the line and scope of [the official's] employment' are, in effect, official-capacity claims and therefore barred by § 14." *Pinkard*, 2022 WL 1721483, at *5 (Ala. May 27, 2022).

One subsequent development provides some evidence that the Alabama Supreme Court's decision in *Pinkard* controls. In *Gaines v. Smith*, No. 1210304, 2022 WL 17073033, --- So. 3d. ---- (Ala. Nov. 18, 2022), the Alabama Supreme Court considered an arrestee's official- and individual-capacity claims against a sheriff and deputies arising from their role in what the arrestee asserted was a delayed bond hearing. The Alabama Supreme Court found the arrestee's

McKenzie does not assert any claims against the defendants in their official capacities as

Sheriff Deputies.  (*See generally* doc. 5).  While some courts have recognized such immunity for

officers sued in their individual capacity, this is when the alleged action is, in effect, one against

the State.  *See Philips v. Thomas*, 555 So. 2d 81, 83 (Ala. 1989).  That is not the case here.

Furthermore, McKenzie is not alleging that the deputies were negligent or made an innocent

mistake.  McKenzie alleges at least one of the deputies violently attacked her without provocation.[4]

Because McKenzie seeks to hold the deputy defendants personally liable for intentional, unlawful

conduct, § 14's bar is not implicated.[5]  *See Cooper v. Smith*, No. 1:12-CV-889-WKW, 2013 WL

252382, at *2 (M.D. Ala. Jan. 23, 2013)

The deputies' motion to dismiss Count IV of McKenzie's Amended Complaint is **DENIED**

as to Count 4.

---

official-capacity claims for monetary relief against the officers were barred by § 14 immunity.
*Id.* at *3 (citing *Pinkard*).  However, it made no such finding about the arrestee's individual-
capacity claims—nor did it even mention the availability of sovereign immunity.  Instead, the
court addressed the merits of the arrestee's "surviving" individual-capacity claims, concluding
that the arrestee could not prevail on them because the officers lacked the authority to provide
the relief sought. *Id.* at *4-5.  Although this is not dispositive of the issue, the fact that the
Alabama Supreme Court chose to reach the merits rather than rely on the jurisdictional immunity
issue suggests it did not consider immunity available.  *See Loachapoka Water Auth., Inc. v.
Water Works Bd. of Auburn*, 74 So. 3d 419, 422 (Ala. 2011) ("In the absence of subject-matter
jurisdiction, this Court has no power to consider the merits . . . .").

[4] Defendants cite allegations related to the police report to support their assertion that their
actions were justified.  (*See* doc. 14 at 12-14; doc. 26 at 3-5).  In the amended complaint,
McKenzie clearly alleges Officer Cleveland fabricated the facts contained in the police report
after her wrongful, violent arrest.  (See doc. 5 at 6, n.3-5).

[5] To the extent the defendants intend to assert State-Agent Immunity, an "officer, employee or
agent of the state . . . is immune from civil liability in his or her personal capacity when the
conduct" at issue "is based upon the agent's ... [e]xercising judgment in the enforcement of the
criminal laws of the state." ALA. CODE § 36-1-12(c)(4). A plaintiff can overcome this immunity
by proving that the agent "act[ed] willfully, maliciously, fraudulently, in bad faith, beyond his or
her authority, or under a mistaken interpretation of the law." ALA. CODE § 36-1-12(d)(2).
McKenzie has alleged such intentional, willful action to bar State-Agent Immunity at this time.

### 2. Intentional Infliction of Emotional Distress (all Defendants)

McKenzie's Count V is a claim for Intentional Infliction of Emotional Distress ("IIED").

(Doc. 5 at ¶¶ 78-86).  The Alabama Supreme Court first recognized the tort of outrage, or IIED, in

*American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1981).  To establish an IIED claim, a

plaintiff must show that

> (1) the actor intended to inflict emotional distress, or knew or should have known
> that emotional distress was likely to result from his conduct; (2) the conduct was
> extreme and outrageous; (3) the defendant's actions caused the plaintiff distress;
> and (4) the distress was severe. *Harris v. McDavid*, 553 So. 2d 567 (Ala. 1989).
> The conduct alleged must be "so outrageous in character and so extreme in degree
> as to go beyond all possible bounds of decency, and to be regarded as atrocious and
> utterly intolerable in a civilized society." *Id.* at 570; citing *American Road Service
> Co. v. Inmon*, 394 So.2d 361, 365 (Ala. 1980).

*Shepherd v. Summit Mgmt. Co*., 726 So. 2d 686, 694 (Ala. Civ. App. 1998).

> The determination as to whether "evidence is sufficiently extreme or outrageous to
> support a cause of action for outrageous conduct is for the trial court to make as a
> matter of law." *Carter v. Harris*, 64 F. Supp. 2d 1182, 1194 (M.D. Ala. 1999)
> (granting summary judgment on outrage claim). In analyzing whether conduct is
> sufficiently extreme and outrageous to support a claim of outrage, the Court must
> be mindful that outrage is a very limited cause of action. *See, e.g., Thomas*, 624 So.
> 2d at 1044. The Alabama Supreme Court has found that a jury question exists in
> only three types of cases: (1) those involving wrongful conduct with regard to
> family burials; (2) those involving barbaric methods employed to coerce an
> insurance settlement; and (3) those involving egregious sexual harassment. *See,
> e.g., Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000)(nurse failed to establish jury
> question on outrage claim against her employer and former supervisor despite
> having suffered emotional and physical distress when accused publicly of being a
> drug addict, thief and danger to the public); *Carter v. Innisfree Hotel, Inc*., 661 So.
> 2d 1174 (Ala. 1995)(affirming summary judgment on outrage claim where
> plaintiffs alleged that a "peeping tom" watched them through scratches in their
> hotel room's bathroom mirror).

*Leeth v. Athens/Limestone Hosp., Inc.*, CV 07-B-0956-NE, 2009 WL 10688796, at *2 (N.D. Ala.

July 23, 2009) (citing *Hardesty v. CPRM Corp.*, 391 F. Supp. 2d 1067, 1073 (M.D. Ala. 2005).

Although Alabama courts have recognized limited factual bases for an IIED claim, at this

stage of the litigation, and without further argument from the defendants, McKenzie has

sufficiently pled the claim.  Defendants' motion to dismiss is **DENIED** as to Count V.

### IV. Conclusion

For the reasons stated above, Defendants' motion to dismiss (doc. 13) is **DENIED**.  The stay of discovery obligations (*see* docs. 17 & 22) is **LIFTED**.

DONE this 8th day of May, 2023.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE