FILED

2026 Feb-09  PM 03:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| DANITA MCKENZIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  2:23-cv-00002-JHE |
| | ) | |
| THOMAS CLEVELAND, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION[1]

Plaintiff Danita McKenzie ("McKenzie"), through her amended complaint, brings this action alleging violations of her rights under the Constitution and laws of the United States as well as the Constitution and laws of the State of Alabama.  (Doc. 5).  McKenzie named the following defendants in her amended complaint: Deputy Thomas Cleveland, Deputy J. Adams, and Deputy C. Wade.[2]  (*Id.*).  Defendants moved for summary judgment (doc. 49) and filed a memorandum of law in support of their motion (doc. 52).  McKenzie filed a response in opposition to defendant's motion for summary judgment (doc. 54), and the defendants filed a reply brief (doc. 57).  The undersigned ordered supplemental briefing to consider new case law announced by the Supreme Court of Alabama, as to McKenzie's claims brought under state law.  (Doc. 58).  Both parties filed supplemental briefs in response.  (Docs. 59,60).  Having considered defendants' response and supplemental materials, defendants' motion for summary judgment (doc. 49) is **GRANTED**.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 23.)

[2] Deputy Christopher Wade was named in the amended complaint.  (Doc. 5).  McKenzie later moved to dismiss Wade and all claims against him from this action (doc. 44), which the court granted (doc. 45).

# I. Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. (*Id.* at 323). The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." (*Id.* at 324) (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the undersigned "view[s] all evidence and draw[s] all reasonable inferences in the light most favorable to the non-moving party." *Hallums v. Infinity Ins. Co.*, 945 F.3d 1144, 1148 (11th Cir. 2019) (citation omitted); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 225 (1970) (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th

Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

Viewed in the light most favorable to Ms. McKenzie, the facts at issue are as follows:

### A. Background

The allegations in Ms. McKenzie's complaint arise out of an incident that occurred on or about May 12, 2022, after she called law enforcement to her home. (Doc. 5 at ¶ 8).  Following Ms. McKenzie's 9-1-1 call, Deputy Cleveland was dispatched to her residence to respond to a domestic violence incident.  (Doc. 52 ¶ 4).  Ms. McKenzie reported that her fiancé, James Fields ("Fields"), pushed her into the bedroom, threw her on the ground, got on top of her, and choked her.  (Doc. 56-2 at 102:23-103:7).  Fields was struck by a vehicle in 2020 and sustained severe physical injuries and traumatic brain injuries.  (Doc. 5 at ¶ 9).  Since the accident, Fields sometimes experiences outbursts stemming directly from his traumatic brain injury.  (*Id.* at ¶ 10).

### B. Body Camera Footage

At the summary judgment stage "[w]hen video evidence is available, we must "view[ ] the facts in the light depicted by the videotape," so long as "[t]here are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened." *Cunningham v. Cobb Cnty.*, No. 24-10879, 2025 WL 1732890 at *5 (11th Cir. June 23, 2025) (quoting *Scott v. Harris*, 550 U.S. 372, 378, 381 (2007)).  Defendants have submitted bodycam footage from both detectives Cleveland and Adams to support their motion for summary judgment.  (Docs. 51-1; 51-4).  Plaintiff does not make any

allegations that the bodycam footage has been altered in any way. *See* (Doc. 54). As such, the undersigned relies upon the video footage to assess Ms. McKenzie's excessive force claim.[3]

Deputy Cleveland was the first officer to arrive at Ms. McKenzie's home following her 911 call.[4] (Doc. 51-1, "Cleveland Bodycam"). Upon arriving at McKenzie's home, Deputy Cleveland first encountered Fields, who said "she [McKenzie] attacked me, and I responded by grabbing her throat, so she called y'all." (Cleveland Bodycam at 0:00:50-0:00:56). Deputy Cleveland notes there is blood on Fields' hand and asks whether the blood is his. Fields responds that the blood was from the dog. (*Id.* at 0:01:16-0:01:19). After his conversation with Fields, Deputy Cleveland approaches McKenzie, who is standing on the front porch, and begins speaking with her. Deputy Cleveland notes that McKenzie has blood on her face and asks whether the blood belongs to Fields. McKenzie responds that it is her blood and that she is bleeding from her mouth. (*Id.* at 0:04:00-0:04:10).

Deputy Cleveland asks McKenzie what happened prior to her calling 911, and she responded that she called 911 "because he [Fields] was choking me." (*Id.* at 0:04:57-0:05:04). Deputy Cleveland returns to his vehicle, radios in and communicates that he believes "this female is going to call for medics on her own [telephone]," and that "it's lookin' like both of these people

---

[3] McKenzie asserts in her amended complaint that "[a] video of the entire incident was captured on McKenzie's Ring video doorbell camera." (Doc. 5 at nn. 2-5; ¶ 84). However, no party submitted the Ring doorbell footage as summary judgment evidence. Therefore, any such footage cannot be considered. *See Wright v. Farouk Sys., Inc.*, 701 F.3d 907, 911 n. 8 (11th Cir. 2012) ("[P]leadings are only allegations, and allegations are not evidence of the truth of what is alleged.").

[4] Deputy Cleveland's body camera footage was admitted into evidence in support of Defendants' motion for summary judgment under conventional filing. (Docs. 50; 51-1). This Memorandum Opinion cites the timestamps of the video file admitted into evidence rather than the timestamps displayed on the body camera footage itself (and does the same for any other video footage).

are fixin' to go." (*Id.* at 0:09:34-0:10:29).  Deputy Adams arrives on the scene, and he and Deputy Cleveland have a conversation with Fields regarding the incident.[5]  (Doc. 51-4, "Adams Bodycam" at 0:00:26-0:01:34).  Deputy Cleveland summarizes the course of events that Fields communicated for Deputy Adams, stating that McKenzie and Fields were arguing, and Fields had indicated to Cleveland that McKenzie started hitting Fields in the face. (Adams Bodycam at 0:01:03-0:01:11).  Fields nods his head in the affirmative and says, "yep." (*Id.* at 0:01:11-0:01:12).

Fields adds, "it was the left side she hit," and "[s]he was hitting my left side, so I grabbed her throat and threw her down and she said, 'I'm calling 911.'" (*Id.* at 0:01:19-0:01:30; Cleveland Bodycam at 0:19:56-0:20:17).  Deputy Adams goes up the porch steps to speak to McKenzie, who is still standing on the front porch.  (Adams Bodycam at 0:04:42).  Following some discussion, McKenzie tells Adams that "he [Fields] choked me." (*Id.* at 0:07:16).  Cleveland's bodycam footage shows the front porch where McKenzie is speaking with Deputy Adams.  (Cleveland Bodycam at 0:25:28-0:26:11).  Adams asks McKenzie what happened that day to prompt her to call 911 and, after appearing to read text messages from who she claims to be Fields' lawyer, McKenzie tells Adams "he [Fields] choked me." (Adams Bodycam at 0:04:46-0:07:16).  Finally, McKenzie tells deputies to either take Fields to UAB Hospital or "put him in the house" and she will call 911 again for medics.  (Cleveland Bodycam at 0:26:04-0:26:10).  It is at this point that the altercation at issue occurs.

As previously noted, Deputy Adams is standing with McKenzie on the front porch.  Until she makes her statement about putting Fields "back in the house" if the deputies were not going to transport him to UAB hospital, McKenzie is facing away from her house, toward the front yard.

---

[5] Deputy Adams' body camera footage was admitted into evidence to support Defendants' motion for summary judgment under conventional filing.  (Docs. 50; 51-4).

Upon making this statement, McKenzie turns to her right, toward the door. (Adams Bodycam at 0:07:35). As McKenzie is turning toward the door, she faces Adams. (*Id.*). As McKenzie reaches toward the door with her right hand, Adams begins to walk around to McKenzie's back, takes his handcuffs off his belt, tells McKenzie to "turn around and put your hands behind your back," and takes hold of McKenzie's left arm. (*Id.* at 0:07:36-0:07:38; Cleveland Bodycam at 0:26:11). At this point, McKenzie's left arm is in Adams' hand, and he is placing handcuffs around her left wrist; Cleveland is approaching McKenzie from the front. (Adams Bodycam at 0:07:35-0:07:38). McKenzie says "no, my kid's in here." (*Id.*).

At this point in the footage, McKenzie has her right hand on the doorknob. Deputy Adams has her left wrist in both of his and Deputy Cleveland has McKenzie's left hand in his right hand and her right hand in his left. (Cleveland Bodycam at 0:26:14). McKenzie is holding on to the doorknob with her right hand. Deputy Cleveland releases McKenzie's left hand and strikes her right arm two to three times, causing her to release her hold on the doorknob. (Adams Bodycam at 0:07:38-0:07:40). After she releases the doorknob, McKenzie is brought to the ground. As McKenzie is being brought to the ground, she says she didn't do anything wrong, and Deputy Cleveland replies "you're resisting now." (Cleveland Bodycam at 0:26:17-0:26:24). In bringing McKenzie to the ground, Adams has her left arm in his hand and his other hand on her back/top, while Cleveland is holding McKenzie's right arm. (Adams Bodycam at 0:07:41-0:07:45). At this point, Adams' body camera falls off his uniform. (*Id.* at 0:07:45). Cleveland's body camera footage shows that McKenzie is face-down on the ground with her hands behind her back and her arms are being restrained by both deputies while they place handcuffs on her. (Cleveland Bodycam at 0:26:23-0:26:37). Once the handcuffs are placed, Adams puts his body camera back onto his

6

uniform, and neither deputy continues touching McKenzie. (*Id.* at 0:26:37; Adams Bodycam at 0:08:03).

The deputies move McKenzie to a seated position on the front porch. (Cleveland Bodycam at 0:26:44-0:27:03; Adams Bodycam at 0:08:17-0:08:21). McKenzie said, "he [Fields] hit me and choked me," and "I didn't do anything but call y'all for help because he choked me and hit me" (Cleveland Bodycam at 0:27:13-0:27:53; Adams Bodycam at 0:08:19-0:09:54). Following this, McKenzie is placed in Deputy Wade's patrol vehicle.

As a result of the incident. McKenzie alleges she has suffered and continues to suffer from anxiety, post-traumatic stress, and constant fear of law enforcement officials. (Doc. 5 at ¶ 38). McKenzie is currently seeking treatment from a licensed counselor for her alleged emotional and psychological injuries. (*Id.* at ¶ 39).

### III. Analysis

McKenzie asserts her federal claims under 42 U.S.C. § 1983, alleging that Defendants subjected her to excessive force (Count I) and violated her Fourth Amendment right to be free from unreasonable seizure (Count II). (Doc. 5 at 8-10). She also alleges under § 1983 that Deputy Adams wrongfully failed to intervene and prevent Deputy Cleveland from violating McKenzie's rights (Count III). (*Id.* at 10-11). McKenzie also alleges that Defendants committed assault and battery (Count IV) and intentional infliction of emotional distress (Count V) in violation of Alabama law. Defendants argue that they are entitled to qualified immunity as to all federal claims, and that they are entitled to absolute immunity under the Alabama Constitution as to McKenzie's state law claims.[6] (*See* Doc. 52, generally).

---

[6] McKenzie waived Count III – Failure to Intervene. (Doc. 54 at 30).

**A. Federal Claims**

Qualified immunity shields "government officials who were sued individually 'unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances.'" *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013) (citation omitted). To receive the protection of qualified immunity, the government official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004). Discretionary authority includes "all actions of a governmental official that (1) 'were undertaken pursuant to the performance of his duties,' and (2) were 'within the scope of his authority.'" *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)).

Once an official establishes that he is acting within his discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is inappropriate. *White v. City of Birmingham*, 96 F. Supp. 3d 1260, 1285 (N.D. Ala. 2015). To determine whether a defendant is entitled to qualified immunity, the undersigned must address two questions: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" (2) "If a violation could be made out on a favorable view of the parties' submissions, . . . [was] the right . . . clearly established?" *Gonzalez v. Reno,* 325 F.3d 1228, 1234 (11th Cir. 2003) (*citing Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)). "When, as here, qualified immunity is asserted in the context of a motion for summary judgment, the evidence in the record must be interpreted in the light most favorable to the nonmoving party. Based on this evidence, we must determine if there is a reasonable dispute of

material fact as to whether the deputies violated Ms. McKenzie's clearly established constitutional rights." *O'Rourke v. Hayes*, 378 F.3d 1201, 1206 (11th Cir. 2004).

Defendants have shown that they were operating within the discretionary parameters of their roles under the color of state law.  *See Odom v. Boisvert*, No. 23-11226, 2024 WL 3649048 at *3 (11th Cir. 2024) ("our case law and common sense tell us that responding to a 911 call, apprehending a suspect, and making an arrest . . . are at the heart of a police officer's duties."). McKenzie argues that Deputies Cleveland and Adams were not acting within their discretionary authority because, according to McKenzie, they failed to follow the arrest procedures outlined in the Jefferson County Sheriff's Office Policy and Procedural Manual (the "Manual") when responding to a domestic violence call.  (Doc. 54 at 13).  The portion of the Manual cited by McKenzie states as follows:

> If both parties appear to be the victim, determine if one acted in self-defense.  If neither acted in self-defense, determine which one is the primary aggressor and arrest only that party.   In determining whether a person is the primary aggressor, the deputy shall consider all of the following:
>
> - Prior complaints of domestic violence
> - The relative severity of the injuries inflicted on each person
> - The likelihood of future injury to each person
> - Whether one of the persons acted in self defense
>
> If neither can be determined, call the supervisor.

(Doc. 51-2 at 78; Doc. 55-4 at 4).  McKenzie argues that, because the Manual sets out parameters for decision-making regarding arrests in domestic violence calls, the defendants' "discretion" was removed by the policy set out in the Manual and, therefore, the defendants could not have been acting within their discretionary authority.  (*See* Doc. 54 at 13-16).

McKenzie argues that the course of action outlined in the Manual "wholly eliminated Defendants' discretion when making an arrest in response to a domestic violence call" and,

therefore, the defendants may not assert qualified immunity as a defense." (Doc. 54 at 16). Taking this argument to its logical conclusion, however, prompts the question of whether the mere presence of a Manual or department policy negates qualified immunity if it is not followed to the letter. A similar argument was dismissed by the Supreme Court of the United States in *Davis v. Scherer*, 468 U.S. 183 (1984). In *Davis*, the lower courts held that the plaintiff's superiors were not entitled to qualified immunity with regard to the plaintiff's claim that his discharge violated his 14th Amendment due process rights because plaintiff's superiors had "followed procedures contrary to the department's rules and regulations" and, therefore, "were not entitled to qualified immunity because their belief in the legality of the challenged conduct was unreasonable." *Davis*, 468 U.S. at 188-189. The plaintiff in *Davis* argued, similarly to McKenzie, that "a defendant official's violation of a clear statute or regulation, although not itself the basis of suit, should deprive the official of qualified immunity from damages for violation of other statutory or constitutional provisions." *Id.* at 193.

The Supreme Court overturned the decision, explaining that,

> . . . our cases had made clear that, under the "objective" component of the good-faith immunity test, an official would not be held liable in damages under § 1983 unless the constitutional right he was alleged to have violated was clearly established at the time of the violation. Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provisions.
>
> . . .
>
> Appellee's submission, if adopted, would disrupt the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties. The qualified immunity doctrine recognizes that officials can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated. Yet, under appellee's submission, officials would be

liable in an indeterminate amount for violation of any constitutional right – one that was not clearly defined or perhaps not even fore shadowed at the time of the alleged violation—merely because their official conduct also violated some statute or regulation.  And, in § 1983 suits, the issue whether an official enjoyed qualified immunity then might depend upon the meaning or purpose of a state administrative regulation, questions that federal judges often may be unable to resolve on summary judgment.
. . .

Nor is it always fair, or sound policy, to demand official compliance with statute and regulation on pain of money damages.  Such officials as police officers or prison wardens, to say nothing of higher level executives levels who enjoy only qualified immunity, routinely make close decisions in the exercise of the broad authority that necessarily is delegated to them.  These officials are subject to a plethora of rules, often so voluminous, ambiguous, and contradictory, and in such flux that officials can only comply with or enforce them selectively.  In these circumstances, officials should not err always on the side of caution.  Officials with a broad range of duties and authority must often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office.

*Davis*, 468 U.S. at 194-196 (internal quotations and citations omitted); *See also*, *Jordan*, 38. F.3d at 1566 (determining that "an act must be discretionary to receive the protection of qualified immunity" is "an overly narrow interpretation of the term 'discretionary authority."); *Dolihite v. Maughon By and Through Videon*, 74 F.3d 1027, 1044 (11th Cir. 1996) ("no cases hold that a government official's violation of facility or department policy, without more, constitutes a constitutional violation.").

Given the foregoing, even operating under the presumption that the defendants did fail to follow the procedure set out in the Manual, that failure does not deprive them of qualified immunity.  Therefore, because the deputies were acting within the scope of their discretionary authority, whether or not they strictly adhered to procedures as set out in the Manual, the burden shifts to McKenzie to show that Defendants violated a clearly established constitutional right.

### i. Count I: Excessive Force

McKenzie claims that Defendants violated her clearly established constitutional right to be free from excessive force. (Doc. 54 at 12). Defendants assert they are entitled to qualified immunity regarding McKenzie's excessive force claim. (Doc 52 at 11). The Supreme Court has held that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor,* 490 U.S. 386, 396 (1989). "In an excessive force case arising out of an arrest, whether a constitutional violation occurred is governed by the Fourth Amendment's 'objective reasonableness' standard." *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (quoting *Graham,* 490 U.S. at 396). Under *Graham*, a court assessing the objective reasonableness of an officer's use of force looks to a number of factors, including "[1] the relationship between the need for the use of force and the amount of force used; [2] the extent of the plaintiff's injury; [3] any effort made by the officer to temper or to limit the amount of force; [4] the severity of the security problem at issue; [5] the threat reasonably perceived by the officer; and [6] whether the plaintiff was actively resisting." *Patel v. Lanier Cnty. Georgia*, 969 F.3d 1173, 1182 (11th Cir. 2020) (citing *Kingsley*, 576 U.S. at 397, in turn citing *Graham*, 490 U.S. at 396). This list is nonexclusive. *Id*.

McKenzie contends that Defendants engaged in excessive force when they "grabbed" "struck" and "forced her to the ground." (Doc. 54 at 17). Defendants argue that McKenzie attempted to flee and refused to comply with commands. (Doc. 52 at 13). Because there is video footage of the incident in question, it is possible to assess the deputies' use of force using the *Graham* factors, and determine whether any Defendant violated McKenzie's right to be free from

excessive force.  First, the relationship between the need for force and the amount of force used by the defendants is at issue.  McKenzie asserts that after she announced she was going to call 911 for "further assistance" and turned to enter her home when the Defendants "grabbed [her], struck her several times, and forced her to the ground."  (Doc. 54 at 18).  The video footage, however, shows that Adams instructed McKenzie to turn around and place her hands behind her back, to which she responds "no, my kid's in here."  (Adams Bodycam at 0:07:35-0:07:38).  Preparing to place Ms. McKenzie in handcuffs, Adams did take hold of her left arm.  There is no reasonable argument that holding someone's arm to place handcuffs on them is excessive force.

During this interaction, McKenzie is holding on to her doorknob with her right hand.  (*Id.* at 0:07:39).  It is true that Deputy Cleveland struck McKenzie's right arm two or possibly three times.  (*Id.* at 0:07:40-:0:07:42).  However, comparing the need for the use of force and the amount of force used, the amount of force used by Deputy Cleveland is not excessive.  McKenzie was clearly holding on to her doorknob after being instructed to place her hands behind her back.  Cleveland used force to release McKenzie's grip from the doorknob and, once her grip was released, Cleveland did not use any additional force or administer any further strikes.  As such, the officers used a reasonable amount of force to accomplish the necessary task – to have McKenzie place her hands behind her back so that she can be handcuffed.  Following McKenzie releasing the doorknob, Defendants put her on the ground and handcuff her.  (Adams Bodycam at 0:07:41-0:07:46; Cleveland Bodycam at 0:26:17-0:26:37).  McKenzie characterizes the encounter as her being "forced" to the ground (doc. 54 at 18), while Defendants argue that McKenzie lost her balance, and she was taken to the ground by her own momentum (*see* docs. 51-2 at 24; 87:10-88:15; 51-3 at 17; 59:5-60:19).  It is, admittedly, impossible to tell whether McKenzie's momentum toward the ground began with her losing her balance or from Adams and Cleveland

putting her on the ground.  Regardless, however, the body camera footage shows Adams and Cleveland guiding McKenzie's body to the ground and placing her in handcuffs.  (Adams Bodycam at 0:07:41-0:07:46; Cleveland Bodycam at 0:26:17-0:26:37).  She was not shoved, thrown, or slammed on the ground, and once her wrists were secured in handcuffs, neither deputy touched McKenzie at all until they helped her into a seated position.  (Cleveland Bodycam at 0:26:14-0:27:01; Adams Bodycam at 0:07:38-0:08:24).  Given the foregoing, the amount and duration of force is reasonably balanced with the need for the use of force.

The second and third factors in this matter are interrelated and weigh in the defendants' favor.  As for the second factor, McKenzie testified that she "suffered bruises and pain in her arms, knees, and back" because of the arrest.  (Doc. 51-5 ¶ 5).  She includes a photo of her bruised arm in support of her opposition to Defendants' motion for summary judgment.  (Doc. 55-1).  While she also alleges that she received treatment for "anxiety, depression, and post-traumatic stress disorder (PTSD)" following the arrest, she does not allege that her physical injuries required ongoing medical treatment.[7]  (*Id.*)  McKenzie experiencing bruising and pain, without more, is not sufficient to support her argument that the force used by the defendants was unlawful.  The third factor is any effort made to temper or limit the amount of force used.  The body camera footage shows that the deputies took approximately thirty seconds to restrain McKenzie in handcuffs.

---

[7] McKenzie testified that she was treated for low back pain following the incident.  (Doc. 56-2 at 85:9-86:18).  She elaborated that she saw a chiropractor and a massage therapist for this injury, and had not seen either provider since July of 2022.  (*Id.* at 86:19-89:8).  The treatment record for the chiropractor she saw indicates that her low back pain was due to a fall at a patient's home.  (*Id.* at 85:22-86:15).  McKenzie was asked whether the low back pain was related to her arrest, and she said that her back "had not hurt" until the arrest, but she did not tell the chiropractor about the incident because "[i]t was embarrassing." (*Id.* at 87:2-10).  McKenzie also alleges that she had bruising on her arm from the arrest, but that she had not told any medical professionals about those injuries and had not received any treatment.  (Doc. 56-3 at 175:17-176:15).

(Adams Bodycam at 0:07:36-0:08:02; Cleveland Bodycam at 0:26:13-0:26:37). Cleveland struck McKenzie's arm to have her release the doorknob and Deputies McKenzie and Adams put McKenzie on the ground to put handcuffs on her. The body camera footage does not suggest that more force was used than what was necessary to effectuate the arrest.

The Eleventh Circuit has explicitly stated that "permissible levels of force may nevertheless cause some pain and injury." *Johnson v. Conway*, 688 Fed. Appx. 700, 709 (11th Cir. 2017); *see also Brown v. City of Huntsville*, 608 F.3d 724, 740 (pulling a detainee out of their car is a permissible use of force in effectuating arrest); *Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000) ("a minimal amount of force and injury … will not defeat an officer's qualified immunity in an excessive force case."); *Gold v. City of Miami*, 121 F.3d 1442, 1446-47 (11th Cir. 1997) (The Eleventh Circuit determined that officers who arrested the plaintiff for disorderly conduct were entitled to qualified immunity when the plaintiff "experienced pain from the handcuffs for roughly twenty minutes and . . . suffered only skin abrasions for which he did not seek medical treatment. The minor nature of this injury reflects that minimal force was used."). On the continuum of types of force an officer could use to gain compliance, striking the plaintiff's arm to have her release the door so that she could be handcuffed is fairly low – particularly when, as in this case, no severe or permanent physical injury was caused.

The fourth and fifth elements – the severity of the security problem and the threat reasonably perceived by officers – can also be analyzed at the same time. Prior to McKenzie being arrested, she attempted to go back into her house. Deputy Adams instructed her to place her hands behind her back, but she refused and held on to the doorknob. When asked if someone retreating back into their home constitutes a high risk situation, Deputy Adams testified, "absolutely." (Doc. 51-3 at 22; 79:10-13). He also noted in his deposition that he was "not going to allow her to retreat

into her home and possibly get a weapon to harm me." (*Id.* at 17; 60:10-19). The potential security threat of McKenzie returning into her home is a reasonable justification for the use of force that was exerted. *See Williams v. City of Montgomery*, 839 Fed.Appx. 356, 362 (11th Cir. 2020)("The officers confronted a man wanted on five felony charges who they thought attempted to deceive them about his identity. The officers responded reasonably by seizing Williams before he could retreat into his home and possibly arm himself." *citing Nolin*, 207 F.3d at 1255; *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559-60 (11th Cir. 1993)). Finally, whether the detainee is actively resisting must be evaluated. The body camera footage clearly shows McKenzie was resisting. She verbally told Deputy Adams "no" when he instructed her to put her hands behind her back, and then she proceeded to hold onto her doorknob until Deputy Cleveland struck her arm to break her grip.

Considering the totality of the *Graham* factors, the undersigned concludes that the force the defendants used was "reasonably proportionate to the need for that force," *Lee v. Ferraro*, 284 F.3d 118, 1198 (11th Cir. 2002), and thus the defendants did not violate McKenzie's Fourth Amendment rights and subject her to excessive force. As such, the defendants' motion for summary judgment is due to be **GRANTED** as to the excessive force claim.

### ii. Count II: Unreasonable Seizure

"The Fourth Amendment protects individuals from unreasonable seizures— including unreasonable arrests." *Perkins v. Thrasher*, 701 Fed. Appx. 887, 889 (11th Cir. 2017). An arrest lacking probable cause can be construed as an unreasonable seizure. (*Id.*) "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007) (citing *United States v.*

*Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002)). However, a violation of the fourth amendment does not proactively pierce qualified immunity, so long as the officer has "arguable probable cause." *Id.* Arguable probable cause is demonstrated by "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] could have believed that probable cause existed to arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002) (quotations omitted). An officer who makes an arrest without arguable probable cause, violates the detainee's clearly established Fourth Amendment right to be free from unreasonable seizures. *Carter v. Butts Cnty.*, 821 F.3d 1310, 1320 (11th Cir. 2016).

Under Alabama law, domestic violence in the third degree includes "striking . . . a person with whom the defendant had a current or former dating relationship. *See* Ala. Code § 13A-6-132, 13A-11-8. While McKenzie did contact 9-1-1 and allege that Fields attacked her, Fields told Officer Cleveland that McKenzie had struck him, and an altercation ensued. (Doc. 51-7). This is sufficient to establish arguable probable cause to arrest McKenzie. The Eleventh Circuit has been clear that the arguable probable cause standard "recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who unreasonably conclude that probable cause exists." *Skop* 485 F.3d at 1137. The undersigned finds that Cleveland had at least arguable probable cause to arrest McKenzie.[8] Therefore,

_____

[8] Fields disclosed to Cleveland that he had been previously arrested for domestic violence and that the prior arrest also involved McKenzie. (Cleveland Bodycam at 0:02:13-0:02:18). McKenzie also indicates to Cleveland that Fields "got arrested last time for doing the same thing." (*Id*. at 0:03:46). Later, defendant Adams asked Fields if he and McKenzie had a history of domestic violence and Fields confirmed that he "went to jail in January." (*Id*. at 0:36:02). The Manual does indicate that "[p]rior complaints of domestic violence" should be considered in determining the primary aggressor. (Doc. 51-2 at 78; Doc. 55-4 at 4). However, the manual does not indicate that a prior domestic violence complaint is, or should be, determinative. Furthermore, simply because Fields was determined to be the primary aggressor in the prior incident, does not

Defendants' motion for summary judgment is **GRANTED** as to Ms. McKenzie's Count II: Unreasonable Seizure.

### iii. Count III: Failure to Intervene

McKenzie conceded her claims as to her third count against Deputy Adams in her response in opposition to Defendants' motion for summary judgment. (Doc. 54 at 29).   Therefore, Defendants' motion for summary judgement is **GRANTED** as to McKenzie's Claim III: Failure to Intervene.

### B. State Law Claims

McKenzie also asserts state-law claims for assault and battery and intentional infliction of emotional distress.   In Alabama, a sheriff is an executive officer pursuant to the Alabama Constitution of 1901, Article V, § 112.   As an executive officer, a sheriff is immune from being sued in the execution of the duties of his office under Article I, § 14 of the Alabama Constitution. Further, a sheriff, as an employee of the State, "is immune from suit, in his official capacity, for negligent performance of his statutory duties."  *Ex parte Haralson*, 853 So. 2d 928, 932 (Ala. 2003) (citations omitted).  Deputy sheriffs enjoy  the same immunity because they are the "alter ego" of the sheriff.  *Id.* (citations omitted).  A deputy sheriff sued in his "official capacit[y] and individually" is immune from suit when the action is, in substance, one against the State.  *Id.* (citing *Phillips v. Thomas*, 555 So.2d 81, 83 (Ala.1989)).

For years, Alabama courts extended State immunity to sheriffs and other state officers if "the duty allegedly breached [was] owed solely because of the officer or employee's official position." *Ex parte Cooper*, 351 So.3d 501, 502 (Ala. 2021) (citing *Barnhart v. Ingalls*, 275 So.

---

mean that he should necessarily be determined to be the primary aggressor in any subsequent incidents.

18

3d 1112, 1125-27 (Ala. 2018)).  However, more recently, the Alabama Supreme Court held that "nothing in the text of § 14 [of the Alabama Constitution] prohibits courts from hearing a claim against an individual State employee if the claim does not name or seek relief from the state," appearing to overrule *Barnhart*.  *See Ex parte Pinkard*, ___ So. 3d ___, 2022 Ala. LEXIS 42, 2022 WL 1721483 at *6 (Ala. 2022).

The Alabama Supreme Court subsequently clarified the continued vitality of constitutional immunity for sheriffs and their deputies  in *Ex parte Underwood*, holding that claims against a sheriff's deputy arising out of his attempt to apprehend a suspect must be dismissed where the complaint does not allege that the deputy  "acted outside the line and scope of his duties. . ." 2025 WL 1776225 at *4 --- So. 3d ---- (Ala. June 27, 2025).  The  court emphasized that this  "long line of constitutional precedent concerns the separate and distinct immunity that is conferred on executive officers of the State and, thus, does not stand in tension with our Court's decision in *Ex parte Pinkard*, 373 So. 3d 192 (Ala. 2022), which addressed a statutory officer's entitlement to State immunity."  *Id.* at *2; n.3.  Given the holding in *Ex parte Underwood*, the undersigned directed the parties to file supplemental briefing addressing whether McKenzie's state law claims are barred under *Underwood's* analysis of Article I § 14 of the Alabama Constitution.  (Doc. 58). The parties' supplemental briefing has been submitted and reviewed.  (Docs. 59, 60).

The undersigned has already determined  that Deputies Cleveland and Adams were acting within the scope of their discretionary authority during McKenzie's arrest.  That determination resolves the dispositive issue under *Underwood*.  Because the deputies were acting within the line and scope of their duties, they are entitled to State immunity under Article I § 14 of the Alabama Constitution. Accordingly, Defendants' motion for summary judgment is due to be **GRANTED**

19

as to McKenzie's assault and battery and intentional infliction of emotional distress claims.[9]

## IV. Conclusion

For the forgoing reasons, defendant's motion to for summary judgement is **GRANTED** as to all claims, and this matter is due to be **DISMISSED WITH PREJUDICE**.  A dismissal order will be entered contemporaneously herewith.

DONE this 9th day of February, 2026.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE

---

[9] As support for her claim of intentional infliction of emotional distress, McKenzie presents the fact that her son was present when the arrest occurred and saw the entire interaction.  (Id. at ¶¶ 80-81).  She also claims that defendant Cleveland "falsified the arrest information sheet" and subjected her to unnecessary criminal charges, arrest, and booking.  (Id. at ¶ 84).  Other than the fact that she has a different point of view regarding what took place on the day of the incident, McKenzie puts forth no evidence that the arrest information sheet was falsified.  Further, the undersigned already determined hereinabove that Defendants had arguable probable cause to arrest McKenzie.  Therefore, the argument that her arrest and charges were "unnecessary" cannot stand.